**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **KAY F. FARRELLY** | : | **CIVIL ACTION** |
| | : | **NO. CCB 08CV1992** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ACME MARKETS, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Elizabeth Malloy, Esquire (*admitted pro hac vice*)
Peter Duhig, Esquire
Buchanan Ingersoll & Rooney, PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
Phone: (215) 665-5310

*Attorneys for Defendants*
*Acme Markets, Inc. and Albertsons, Inc.*

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................ 2

    A.  Parties and Background ............................................................................ 2

    B.  Defendants' Policies Prohibiting Discrimination ........................................... 3

    C.  Defendants' Employee Purchase Policies ..................................................... 3

    D.  Plaintiff's Personal and Medical History ..................................................... 5

    E.  Plaintiff's History of Requests for Schedule Changes ................................... 6

    F.  Termination of Plaintiff's Employment For Violation of the Employee Purchase
       Policies ................................................................................................. 8

    H.  Plaintiff's Disability Discrimination Claims ................................................ 12

    I.  Plaintiff's Applies for and Receives Social Security Disability Benefits ........ 13

III.  PROCEDURAL HISTORY ............................................................................. 13

IV.  ARGUMENT ................................................................................................. 14

    A.  Summary Judgment Standard .................................................................... 14

    B.  The McDonnell-Douglas Burden Shifting Analysis ...................................... 15

    C.  Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination Because
       She Is Not Disabled as a Matter of Law. ..................................................... 16

    D.  Plaintiff Cannot Establish that Defendants' Legitimate Reasons For Her Termination
       were a Pretext for Discrimination. .............................................................. 21

    E.  Plaintiff Cannot Establish that Defendants Failed to Provide a Reasonable
       Accommodation for her Alleged Disability. ................................................ 25

V.   CONCLUSION .............................................................................................. 28

I.     **INTRODUCTION**

On or about July 11, 2008, Plaintiff, Kay Farrelly ("Plaintiff" or "Farrelly"), filed a

Complaint against Defendants Acme Markets, Inc. and Albertsons, Inc. (together "Defendants"

or "Acme")[1] alleging that Defendants discriminated against her on the basis of her alleged

disability when her employment as a clerk was terminated effective July 27, 2006, in violation of

the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA") and the Maryland Fair

Employment Practices Act, MD. CODE Art. 49B ("FEPA").

Defendants seek summary judgment on all of the claims against them alleged in

Plaintiff's Complaint.  This Court should grant Defendants' Motion as the undisputed facts

conclusively establish that each and every one of Plaintiff's claims against Defendants fails as a

matter of law because:  (1) Plaintiff cannot establish a *prima facie* case of discrimination as she

is not "disabled" as that term is defined under the ADA; (2) Defendants have established a

legitimate reason for Plaintiff's termination which Plaintiff cannot demonstrate was pretextual;

(3) Plaintiff failed to exhaust administrative remedies as to her failure to accommodate claim;

and (4) Plaintiff cannot establish that she was denied a reasonable accommodation for her

alleged disability.

---

[1] In her Complaint, Plaintiff also named as a defendant the United Food and Commercial Workers Union, Local 27 and included a count alleging that the UFCW violated its duties under the National Labor Relations Act.  However, the sole count against the UFCW was dismissed by consent motion on December 18, 2008.

## II.   STATEMENT OF FACTS

### A.   Parties and Background

1.      Acme Markets, Inc. operates retail grocery stores and pharmacies in Delaware, Maryland, New Jersey and Pennsylvania.  (Williams Decl., ¶ 2)[2]  During a portion of Plaintiff's employment with Defendants, Acme was a subsidiary of Albertsons, Inc.  (Williams Decl., ¶ 3)

2.      Plaintiff Kay Farrelly was hired by Acme in 1977 and worked at Acme's Cambridge, Maryland store as a part-time weigher-wrapper in the meat department.  Thereafter, Plaintiff worked at a number of Defendants' stores, including Salisbury, Millsborough and Milford, Maryland.  (Pl. Dep. 16-21)[3]

3.      Plaintiff was terminated from her employment with Acme in June 1994, but later rehired.  Plaintiff believes that her employment was terminated at this time because she was a shop steward and was fighting for her schedule and the schedules of other associates.  (Pl. Dep. 61-62)

4.      Later, Plaintiff was promoted to a full-time weigher-wrapper position at Acme's Easton, Maryland store, and was the only person in this position.  (Pl. Dep. 70)

5.      At all relevant times, the Store Director of the Easton Acme was Stuart Brittingham.  (Pl. Dep. 22)  Plaintiff testified that she got along with Brittingham fine.  (Pl. Dep. 71)

6.      At all times during her employment, Plaintiff was represented by the United Food and Commercial Workers Union, Local 27 ("Local 27").  (Pl. Dep. 16)  During the 1980s, while employed at Acme's Salisbury, Maryland store, Plaintiff was a shop steward.  (Pl. Dep. 16-17)

---

[2] All exhibits cited herein are included in an Appendix, filed concurrently with this brief.  The Declaration of Joan Williams is at Tab 3.

[3] Excerpts from the transcript of Day 1 of Plaintiff's deposition, July 12, 2010, are contained in the Appendix at Tab 1.

**B.      Defendants' Policies Prohibiting Discrimination**

7.      Defendants have numerous policies prohibiting discrimination.  Defendants have a Sexual & Workplace Harassment Policy, which Plaintiff acknowledged receiving.  (Pl. Dep. 23-24; Williams Decl., ¶ 8)

8.      Defendants also have a "Courtesy, Dignity and Respect" pamphlet, which discusses their commitment to a workplace free of unlawful harassment or discrimination. (Williams Decl., ¶ 9)

9.      Defendants also have a Code of Business Conduct which prohibits harassment and other discriminatory conduct, and provided a hotline for employees to report violations. (Williams Decl., ¶ 10)

10.      Furthermore, Defendants have a Non-Harassment, Non-Discrimination policy. (Williams Decl., ¶ 11)

11.      Defendants also have an Equal Employment Opportunity policy.  (Williams Decl., ¶ 12)

**C.      Defendants' Employee Purchase Policies**

12.      In the retail grocery industry, stores generally operate with small profit margins and theft of cash and merchandise is a serious concern.  Therefore, retail grocery companies must be diligent to enforce their policies to prevent theft by employees and customers. (Williams Decl., ¶ 4)

13.      Acme distributes Store Work Rules to its associates.  Plaintiff acknowledges that over the course of her employment with Acme, she received copies of the store work rules or other similar guidelines on several occasions.  (Pl. Dep. 24-27)

14.      As of January 1, 1993, Acme's Store Work Rules contained a policy entitled "Purchases by Employees" which provided, in relevant part:

3

> We encourage our employees to shop in our markets, but shopping in the store in which you work is subject to the following conditions:…
>
> 2.      You may shop for and purchase merchandise when you are off duty.  All merchandise must be placed on the checkstand so the cashier can record the price on the register in the same manner as all other customer purchases are recorded.
>
> 3.      ***Any merchandise purchased for consumption by you on Company property during your regularly scheduled break or meal period must be purchased prior to consumption or use*** at the register designated by the Store Supervisor.  ***The register tape must be retained as proof of purchase***.  This applies to all employees on all shifts whether the store is open or closed….
>
> 6.      Store Supervision, at its discretion, may personally inspect any packages or containers you wish to remove from the store.

(Williams Decl., ¶ 5) (emphasis added).

15.      As of November 1995, Acme's Store Work Rules contained a policy entitled

"Purchases by Associates" which was substantially similar to the prior policy and provided, in

relevant part:

> …2.      You may shop for and purchase merchandise when you are off duty.  All merchandise must be placed on the checkstand so the cashier can record the price on the register in the same manner as all other customer purchases are recorded.  Purchases are to be removed from the store as soon as they are paid for by the associate.  ***The register tape must be with the merchandise until it is removed from the store.***
>
> 3.      ***Any merchandise purchased for consumption by you on Company property during your regularly scheduled break or meal period must be purchased prior to consumption or use*** at the register designated by the Store Manager.  ***The register tape must be retained as proof of purchase***.  This applies to all associates on all shifts whether the store is open or closed….
>
> 6.      Store management, or their designee, in their discretion, may personally inspect any packages or containers you wish to remove from the store.

(Williams Decl., ¶ 6) (emphasis added)

4

16.      As of May 2003, Acme's Company Retail Policies contained a section entitled "Associates Shopping in Stores" which, similar to its predecessors, provided, in relevant part.

- ***Sales receipts must accompany items to be consumed while on break***, in a designated area in the store….

(Williams Decl., ¶ 7) (emphasis added)

17.      Furthermore, the Company Retail Policies contained an Addendum which included a "Purchases by Associates" policy nearly identical to the November 1995 policy. (Williams Decl., ¶ 7)

18.      Plaintiff was aware of Defendants' policies concerning purchases by employees throughout the tenure of her employment with Acme.  (Pl. Dep. 28-30)  To that end, Plaintiff was aware that products purchased for consumption or use by Acme associates had to be paid for.  (Pl. Dep. 28)  Likewise, Plaintiff was aware that the register receipt for such purchases needed to either be taped to the purchase or retained by the employee.  (Pl. Dep. 28)

**D.      Plaintiff's Personal and Medical History**

19.      On July 8, 2005, Plaintiff's fiancé was killed in an accident.  (Pl. Dep. 73)

20.      Following his death, Plaintiff's physician authorized a two week sick leave, although Defendants permitted her to stay out of work for a longer period of time.  (Pl. Dep. 74).

21.      Plaintiff eventually returned to work full-time as a weigher-wrapper on August 14, 2005, on the same schedule as before her leave.  (Pl. Dep. 73-75, 80, 207-8)

22.      When she returned, she was able to perform her job.  (Pl. Dep. 102, 211)

23.      Following her return, Plaintiff does not recall anyone bringing to her attention problems with her job performance.  (Pl. Dep. 157)

24.      When she returned to work in August 2005, Plaintiff was suffering from depression.  (Pl. Dep. 75-77, 102)

25.     Plaintiff was first diagnosed with depression when she was also diagnosed with Lyme disease, several years before the death of her fiancé.  For this reason, Plaintiff was taking Zoloft for depression for some period preceding her fiancé's death.  (Pl. Dep.76-77, 226).  In June 2006, Plaintiff still was taking Zoloft for her depression.  (Pl. Dep. 75, 205)

26.     Upon returning to work in August 2005, Plaintiff was able to walk, talk to customers, breathe, speak, hear, see, do her job, sit, stand, shower, seek medical attention, and pay her bills.  (Pl. Dep. 210-14, 218)

27.     Plaintiff had difficulties sleeping.  However, with Trazodone, she is able to sleep at night.  (Pl. Dep. 124, 214-16)

28.     In fact, on June 29, 2006, Plaintiff even reported to her doctor that her sleep was "OK".  (Tab 5)

29.     Furthermore, Plaintiff never missed a shift of work nor was she ever late for work due to her sleep difficulties.  (Pl. Dep. 218-19)

30.     Plaintiff also has memory loss which she associates with taking Zoloft.  For example, Plaintiff would put something down and couldn't find it, or lock her keys in the truck. (Pl. Dep. 225)

**E.     Plaintiff's History of Requests for Schedule Changes**

31.     Throughout the course of her employment with Acme, Plaintiff would ask for changes to her work schedule so that she could work more early shifts.  Plaintiff believed for many years that even though she had top seniority, at every store she went to, she was given the worst schedule because of her union duties.  (Pl. Dep. 49)

32.     Likewise, Plaintiff believed that "she had a name as soon as [she] walked into that store" and "all [Acme] ever did to [her]" was because of her union activities.  (Pl. Dep. 51, 149-50)

33.     For example, in January 2006, when Plaintiff was written up for not working the hours she was scheduled to work, Plaintiff believed that Brittingham would not give her what she wanted because of her union activities.  (Pl. Dep. 97-98)

34.     In April 1993, Plaintiff informed the store director that she was being forced to work all nights, but that due to her seniority, she was supposed to work three days beginning at about 7:00a.m., one day from 8:00a.m. to 5:00p.m., and one night.  Plaintiff believes that she was being discriminated against in her schedule because she was union.  (Pl. Dep. 42-44; Tab 6)

35.     In April 2000, Plaintiff filled out a request off form requesting that she be off by 3:00p.m. at least 2 or 3 days per week in accordance with her seniority.  (Pl. Dep. 45-50; Tab 7)

36.     In June 2004, Plaintiff filled out a request off form requesting that she work a six (as opposed to eight) hour shift and be off by 2:00p.m. on Sundays, which request Brittingham denied.  (Pl. Dep. 56-61; Tab 8)

37.     Following her return to work in August 2005 after the death of her fiancé, Plaintiff submitted a request dated November 2, 2005 to Brittingham that she be scheduled to be off on Monday nights instead of Wednesdays so that she could see her therapist, Gay Kern.  (Pl. Dep. 90-93; Tab 9)  Plaintiff generally worked one late shift per week.  (Pl. Dep. 67-68, 80)

38.     By the time the December schedule came out, Plaintiff's schedule had changed in this regard.  (Tab 10)

39.     Additionally, at some time after returning to work following the death of her fiancé, Plaintiff requested from Brittingham that she be permitted to leave at 8:00p.m. on the day

she worked the evening shift.[4]  (Pl. Dep. 81-83)  Plaintiff would come in an hour earlier, so as to work a complete 8-hour shift and still leave at 8:00p.m. one night per week  (Pl. Dep. 124)

40.    Plaintiff presented a note dated June 7, 2006 regarding this request.  (Tab 11)

41.    Beginning no later than May 10, 2006, on any day Plaintiff worked an evening shift, she was permitted to leave by 8:00p.m., having worked a full day  (Williams Decl., ¶ 18)

42.    The reason why Plaintiff wanted to leave at 8:00p.m. was so that she could get home before it was dark.  (Pl. Dep. 99-100)  However, Plaintiff did not have any problems driving in the dark.  (Pl. Dep. 101)  Rather, she was afraid that her car would break down on the road.  (Pl. Dep. 100)  Yet, as Plaintiff acknowledged, it could already be dark more than 2 hours before she would leave work at 8:00p.m.  (Pl. Dep. 101)

**F.    Termination of Plaintiff's Employment For Violation of the Employee Purchase Policies**

43.    On the morning of Friday, June 30, 2006, Plaintiff took a chocolate milk from the store's refrigerator case and put it in the backroom until it was time for her break.  (Pl. Dep. 130)

44.    Plaintiff did not pay for the chocolate milk.[5]

45.    Rather, Plaintiff went to a register, placed the chocolate milk in a bag, and walked out of the store with the product.  (Pl. Dep. 140-43)

---

[4] Plaintiff also spoke with her union about leaving at 8:00p.m.  (Pl. Dep. 107)  She believed that Acme was not properly scheduling her (and others) in accordance with the Local 27 contract because, based on her seniority, she should not have to work nights.  (Pl. Dep. 107-110)

[5] At the time of her deposition, Plaintiff could not recall whether or not she paid for the chocolate milk.  (Pl. Dep. 140, 294-95)  However, in numerous other documents drafted by or on behalf of Plaintiff, including her EEOC charge, Plaintiff has stated that she did not pay for the milk, or does not deny that she did not pay for it.  (Tabs 12, 13, 14, 15)  In any event, as discussed further herein, this does not create a material issue of fact. It is undisputed that Plaintiff did not have a receipt for the milk, as required by the associate purchase policy.

46.    On this date, Acme associate Terry Passwaters[6] approached Brittingham and informed him that she had observed Plaintiff take the Nesquik chocolate milk from the store's refrigerator and walk out of the store without paying for it.  (Brittingham Decl., ¶ 2)[7]

47.    Upon hearing this, Brittingham went outside to the picnic table where several associates, including Plaintiff, were taking break.  Brittingham asked each person present to see the sales receipt for each item being consumed.  (Pl. Dep. 143; Brittingham Decl., ¶ 3)

49.    One associate stated that he purchased a can of Mountain Dew from a vending machine and, therefore, did not have a receipt.[8]  Another associate produced a receipt for his oolong tea.  A third associate produced a receipt for her coffee.  (Brittingham Decl., ¶ 3)

50.    Plaintiff did not have a receipt for the chocolate milk she was drinking.  However, she told Brittingham that she may have paid for it and began searching in the trashcan.  (Pl. Dep. 140, 143)

51.    After Plaintiff returned to work, Brittingham also searched the nearby trashcan, but found no receipt for the Nesquik.  (Brittingham Decl., ¶ 12)

52.    Upon returning into the store, Brittingham reviewed video from the store's surveillance cameras to determine whether the chocolate milk had been purchased that morning.  (Brittingham Decl., ¶ 6; Pl. Dep. 148)  The video showed Plaintiff walk through an unstaffed register with an item in her hand, place the item in a bag, and then walk out.  At no time did the video show that Plaintiff paid for the chocolate milk.  (Brittingham Decl., ¶ 6)

---

[6] Passwaters was a member of Local 27, like Plaintiff, and was not a management employee. (Brittingham Decl., ¶ 2)

[7] The Declaration of Stuart Brittingham is at Tab 4.

[8] Nesquik chocolate milk is not available from any vending machine at the Easton Acme. (Brittingham Decl., ¶ 3)

53.     The following day, July 1, 2006, Brittingham met with Plaintiff, Assistant Store Director Patty Feifer, and Local 27 shop steward Barbara Stanford.  (Pl. Dep. 146-47, 153)

54.     Stanford asked that Acme review the electronic journal tapes from the previous day to find the chocolate milk purchase.  Feifer reviewed all of the purchases made between 7:00a.m. and 11:00a.m. on June 30, 2006, and could not locate a purchase that consisted solely of a Nesquik chocolate milk. (Brittingham Decl., ¶ 7)

55.     Brittingham informed Plaintiff that he had looked for a receipt, but could not find anything.  (Pl. Dep. 147-48)

56.     Plaintiff was then suspended pending termination of her employment for violation of Acme's employee purchase policies.  (Pl. Dep. 148)

57.     In addition, Defendants ran an item movement report for the Nesquik consumed by Plaintiff and found that only one bottle of the product had been purchased on that date. (Brittingham Decl., ¶ 8)  The Nesquik (along with other items) was purchased by an Acme customer using a SuperCard at 7:25a.m.  The customer to whom this SuperCard belonged was not Plaintiff.  (Brittingham Decl., ¶ 9)

58.     On July 20, 2006, a grievance meeting was held regarding Plaintiff's suspension. Plaintiff did not attend the meeting.  (Pl. Dep. 153)  Local 27's business agents, Gil Cephus and Eric Masten attended the meeting on Plaintiff's behalf.

59.     At the conclusion of the meeting, Plaintiff's employment was terminated, effective July 27, 2006.  Plaintiff was sent a letter confirming her termination for violation of Acme's employee purchase policies.  (Tab 16)

60.     Plaintiff's union did not pursue the denial of her grievance to arbitration.  (Pl. Dep. 289)[9]

61.     Plaintiff believes that her termination was discrimination because she was told that Acme said "we finally got the one we wanted," as they had been trying to get rid of her for years because of her union work.  (Pl. Dep. 160-64)  Indeed, Plaintiff believes that Acme "didn't care about a disability or anything else.  They didn't worry, they wanted me."  (Pl. Dep. 165, 195, 201)

62.     Likewise, Plaintiff believes that Brittingham was given recognition for getting rid of Plaintiff and another associate soon thereafter for union reasons.  (Pl. Dep. 168-69)

### G.     Termination of Other Employees For Violation of Acme's Employee Purchase Policies

63.     Between January 1, 2006 and December 6, 2007, Defendants terminated the employment of 35 non-probationary associates in stores covered by the Local 27 Eastern Shore labor agreement for reasons which included violation of the Employee Purchase Policy.  (Williams Decl., ¶ 15)[10]

64.     Of these associates, none had self-identified as having a disability, Acme did not observe that any of these employees had a disability, and Acme has no record of any of these associates requesting a reasonable accommodation for a disability.  (Williams Decl., ¶ 16)

65.     However, Plaintiff believes that there are Acme employees who violated the associate purchase policy and were not similarly disciplined.  Plaintiff believes that Brittingham

---

[9] Excerpts from the transcript of Day 2 of Plaintiff's deposition, August 9, 2010, are contained in the Appendix at Tab 2.

[10] To protect the privacy of non-parties, full employee names and dates of birth have been redacted from the supporting documentation.

would go into the back, get lunchmeat and eat it.  (Pl. Dep. 172-73)  However, Plaintiff did not report this to anyone.  (Pl. Dep. 175, 179-80)

66.     Plaintiff believes that prior to when she came to the Easton store (in the 1990s), Casey Vargas, a non-union meat supervisor, would also eat lunchmeat.  Again, Plaintiff did not report this to anyone.  (Pl. Dep. 180-81)

67.     Plaintiff also believes that on one occasion Passwaters marked more expensive Angus beef as less expensive regular beef.  Plaintiff did not report this either.  (Pl. Dep. 182-83)

68.     Finally, Plaintiff believes that in 1992-1993, Walt Crouse, a former district manager, let Scott Thomas, a former meat manager, have some meat cutting equipment to open his own shop.  Plaintiff believes this is why Crouse no longer works for the company.  (Pl. Dep. 183-87)

### H.     Plaintiff's Disability Discrimination Claims

69.     Plaintiff first filed a charge of discrimination with the Delaware Department of Labor on or about March 26, 2007.  (Pl. Dep. 192; Tab 17)  In this charge, Plaintiff checked only the box for disability discrimination and alleged that she was discriminated against when she was discharged, stating a few facts about the termination.  (Tab 17)  However, this charge was dismissed as Plaintiff was not employed in Delaware.

70.     On or about May 3, 2007, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Maryland Commission on Human Relations.  (Tab 14)  In this charge, Plaintiff again checked only the box for disability discrimination and stated that she was discharged "for erroneously taking a carton of milk during my break and forgetting to pay for it."  (Tab 14)

71.     The EEOC issued a Right to Sue Notice on or about May 7, 2008.  (Tab 18)

12

I.     **Plaintiff's Applies for and Receives Social Security Disability Benefits**

72.      In or about January 2007, Plaintiff applied for Social Security Disability ("SSDI")

benefits.  (Pl. Dep. 317)

73.      In connection with her application for SSDI benefits, Plaintiff had in-person

meetings with the Social Security Administration ("SSA").  (Pl. Dep. 320)

74.      Plaintiff also submitted an electronic application for SSDI benefits.  In this

application, Plaintiff stated "Became unable to work because of my disabling condition on May

4, 2006.  I am still disabled."  (Pl. Dep. 324; Tab 19)

75.      The SSA found Plaintiff to be disabled under its rules on July 1, 2006.  (Tab 20).

76.      Plaintiff believes that as of July 1, 2006, she was not able to work in any job at

all, and would not be able to do so with any accommodation.  (Pl. Dep. 325-27)

**III.    PROCEDURAL HISTORY**

Plaintiff's complaint was filed on August 1, 2008.  (D.E. 1)

Discovery in this case has lasted almost two years.  The discovery end date was first set

as August 3, 2009.  (D.E. 10)  On July 9, 2009, the parties requested an extension of the

discovery end date until December 15, 2009, in part to permit Plaintiff to obtain new counsel

after her original attorney accepted an administrative law judge position in Albuquerque, New

Mexico.  (D.E. 12)  Plaintiff's current counsel entered an appearance on October 2, 2009.  (D.E.

19)  The parties then requested an additional extension of the discovery end date until February

15, 2010 to facilitate the transfer of files between Plaintiff's counsel.  (D.E. 20)  However, in

light of difficulties in transferring the files, on January 27, 2010, the parties requested a stay of

the current scheduling order until such issues could be resolved.  (D.E. 25)  Thereafter, the

parties requested an extension until May 14, 2010 to complete discovery.  (D.E. 28)  In light of

Plaintiff's inability to provide deposition testimony on the date noticed by Defendants, the parties

requested another extension of the discovery end date until June 30, 2010.  (D.E. 30)  Once

Plaintiff was fit to provide deposition testimony, the parties requested one additional extension of

the discovery end date until August 10, 2010.  (D.E. 32)

Despite having been involved in the case for almost a year, Plaintiff's current counsel

served no additional written discovery and took no depositions of Defendants' witnesses.

## IV.   ARGUMENT

### A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes the entry of summary

judgment where the pleadings and supporting materials demonstrate that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A material

fact is one that "might affect the outcome of the suit under the governing law," and a genuine

issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Id.  In this regard, the court may rely only upon those facts supported

in the record, and not simply assertions in the pleadings.  Felty v. Grave-Humphreys Co., 818

F.2d 1126, 1128 (4th Cir. 1987).  Furthermore, a "party cannot create a genuine issue of material

fact through mere speculation or compilation of inferences."  Shin v. Shalala, 166 F. Supp. 2d

373, 375 (D. Md. 2001) (citation omitted).

The Fourth Circuit has recognized that its courts have an affirmative obligation to prevent

factually unsupported claims and defenses from going to trial.  Drewitt v. Pratt, 999 F.2d 774-

778-79 (4th Cir. 1993).  Thus, "if the evidence presented by the nonmoving party is merely

colorable, or is not significantly probative, summary judgment must be granted."  Samuels v.

City of Baltimore, 2009 WL 3348134, *3 (D. Md. Oct. 15, 2009) (citing Anderson, 477 U.S. at

249-50).

As demonstrated below, since there are no genuinely disputed material facts that would preclude entry of summary judgment in favor of Defendants, each count of Plaintiff's Complaint should be dismissed and judgment entered for Defendants.

B.    **The McDonnell-Douglas Burden Shifting Analysis**

In the Fourth Circuit, ADA claims of disability discrimination are analyzed under the familiar McDonnell Douglas burden-shifting framework.  Heiko v. Colombo Sav. Bank, F.S.B., 434 F.3d 249, 258 (4th Cir. 2006).  In order for Plaintiff to establish a claim of discrimination under the ADA,[11] she must show that:  1) she is a disabled person within the meaning of the law; 2) she is otherwise qualified to for the job in question; and 3) she has suffered an otherwise adverse employment decision as a result of discrimination.  EEOC v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir. 2000); Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir. 2001).

Should Plaintiff successfully establish a *prima facie* case of discrimination, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  If Defendants satisfy this burden, the burden returns to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by Defendants are merely a pretext for

---

[11] In Count II of her Complaint, Plaintiff alleges that Defendants' conduct, culminating in Plaintiff's termination from employment in July 2006, violated the Maryland FEPA.  However, prior to October 1, 2007, there existed no private right of action under the FEPA.  See Adams v. Morris, 2010 WL 1540021, *3 (D. Md. Apr. 15, 2010); Samuels, 2009 WL 3348134, at *4; Vaeth v. Bd. of Trustees, 2009 WL 2487076, *4 (D. Md. Aug. 11, 2009); Jarvis v. Chimes, 2008 WL 623402, *7-8 (D. Md. Mar. 4, 2008).  Therefore, Plaintiff's claims must fail as a matter of law.  Furthermore, even if Plaintiff could proceed with her claims under the FEPA, they fail for the same reasons as her ADA claims.  See McCullough v. Prince George's County, 2010 WL 723979, *4 n.4 (D. Md. Feb. 24, 2010) (noting that the FEPA and ADA have "substantially identical provisions").

In addition, in the heading of Count I of her Complaint, Plaintiff references Title VII.  However, Title VII applies to claims of race, color, religion, sex and national origin discrimination.  42 U.S.C. §2000e-2(a)(1).  Here, Plaintiff has alleged only discrimination on the basis of her alleged disability.  Thus, Title VII is inapplicable, and her claims are appropriately analyzed under the ADA.

discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 804-5; <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-253 (1981).

As discussed below, Plaintiff fails to establish a *prima facie* case of discrimination in her various allegations as she is not "disabled" under the ADA.  Moreover, in the event that she can establish a *prima facie* case, Defendants have proffered a legitimate, non-discriminatory reason for Plaintiff's termination, which Plaintiff cannot establish is a pretext for discrimination.

### C.      Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination Because She Is Not Disabled as a Matter of Law.

In order to maintain a cause of action under either a disparate treatment or failure to accommodate theory, Plaintiff must first establish that she is a disabled as that term is defined under the applicable law.[12]  <u>Kriegsman v. Firstworthy</u>, 268 Fed. Appx. 244, 244 (4th Cir. 2008); <u>Rhoads v. F.D.I.C.</u>, 257 F.3d 373, 387 (4th Cir. 2001).  Under the ADA, a "qualified individual with a disability" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds…."  <u>See</u> 42 U.S.C. 12111(8).  In making this showing, a disability is defined as (a) a physical or mental impairment that substantially limits one or more of the major life activities of an

---

[12] While Congress recently broadened the scope of how "disability" is defined under the ADA through enactment of the ADA Amendments Act of 2008 ("ADAAA"), the effective date of the ADAAA is January 1, 2009.  In general, courts must not retroactively apply legislation if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."  <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 280 (1994). Although the Fourth Circuit has not ruled on the issue, courts in this circuit have applied <u>Landgraf</u> and declined to apply the ADAAA to discriminatory conduct which occurred before January 1, 2009.  <u>See</u>, <u>e.g.</u>, <u>Blackburn v. Trustees of Guilford Tech. Cmty. Coll.</u>, 2010 WL 3310247, *2 n.2 (M.D.N.C. Aug. 17, 2010); <u>McCormick v. Verizon Md. Inc.</u>, 2009 WL 2449886, *10 (D. Md. Aug. 7, 2009) <u>Herzog v. Loyola Coll. in Md., Inc.</u>, 2009 WL 3271246, *5 n.3 (D. Md. Oct. 9, 2009); <u>see</u> <u>also</u> <u>Lytes v. D.C. Water & Sewer Auth.</u>, 572 F.3d 936, 941 (D.C. Cir. 2009); <u>Fredricksen v. United Parcel Serv. Co.</u>, 581 F.3d 516, 521 n.1 (7th Cir. 2009); <u>Milholland v. Sumner County Bd. of Educ.</u>, 569 F.3d 562, 565-67 (6th Cir. 2009); <u>EEOC v. Agro Distrib., LLC</u>, 555 F.3d 462, 469 n.8 (5th Cir. 2009).  Here, the discrimination alleged by Plaintiff occurred at the latest in July 2006 when her employment with Acme was terminated. Therefore, this Court should apply the ADA as it existed and was interpreted prior to the enactment of the ADAAA.

individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. See 42 U.S.C. § 12102(2).  However, it is insufficient for an individual alleging that he or she is disabled "to merely submit evidence of a medical diagnosis of an impairment;" rather, the individual must "'demonstrate that the impairment substantially limits a major life activity." Toyota Mfg. Ky., Inc. v. Williams, 534 U.S. 184, 195-98 (2002).  In this regard, "'substantially" in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree'", and these "terms need to be interpreted strictly to create a demanding standard for qualifying as disabled."  Id. at 197.

In order to be "substantially limited" in a "major life activity", an individual must demonstrate that he or she (1) is unable to perform a major life activity that the average person in the general population can perform or (2) is significantly restricted as to the condition, manner or duration under which he or she can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that major life activity.  29 C.F.R. § 1630.2(j)(1)).  In determining whether an individual is so-limited, the Court must consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact or the expected permanent or long-term impact of or resulting from the impairment.  29 C.F.R. 1630.2(j)(2).

When evaluating substantial limitation, courts must consider a plaintiff's ability to compensate for the alleged disability through mitigating measures.  Albertsons, Inc. v. Kirkingburg, 527 U.S. 555, 565-67 (1999).  Consequently, a person whose physical or mental impairment is corrected by medication or other mitigating measures cannot be considered to

have an impairment that substantially limits a major life activity.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999).

      1.   Plaintiff's depression is insufficient to establish that she is disabled under the ADA.

The inquiry as to whether an individual is disabled within the meaning of the ADA is an individualized one, particular to the facts of each case.  See EEOC v. Sara Lee Corp., 237 F.3d 349, 352 (4th Cir. 2001) ("Sara Lee").  Plaintiff has alleged that her disability as of June 2006 is depression.  (Pl. Dep. 204)  However, even if such condition is an impairment under the ADA, this alone is insufficient to establish that Plaintiff is disabled within the meaning of the ADA. See, e.g., Miller v. Danzig, 2001 WL 34780350. *3 (E.D. Va. June 22, 2001) (where plaintiff was able to return to work after severe depression and work in an environment that did not have her under the supervision of one particular individual, she was not a qualified individual with a disability).[13]  This is particularly true where, despite her conditions, Plaintiff was able to, *inter alia*, continuously work full-time from diagnosis until the death of her fiancé and again upon return from leave, care for herself, receive medical attention, and pay her bills.   See, e.g., Jurosko v. Leviton Mfg. Co., 2002 WL 570884, *5 (W.D.N.C. Apr. 10, 2002) (plaintiff was not disabled where she was employed continuously, could read, write, talk, hear, shop, seek medical attention, care for her children, bathe, answer the phone, cook, look for work, pay bills, add, subtract, type, email, use a computer, clean, do chores, date men, and make friends).  Rather, Plaintiff must show that these conditions substantially interfered with a major life activity.

---

[13]  Some cases cited herein arise under the Rehabilitation Act rather than the ADA.  However, the standards are the same.  Smaw v. Commw. of Va. Dep't of State Pol., 862 F. Supp. 1469, 1474 (E.D. Va. 1994).

2.      <u>Plaintiff is not substantially limited in a major life activity.</u>

Plaintiff appears to contend that while she can perform all major life activities, her depression causes her difficulties in sleeping.  In order to establish that she was substantially limited in the major life activity of sleeping, Plaintiff must demonstrate that her sleep was worse than the quality of sleep of the general population.  <u>id.</u> at 352.  Courts have recognized that "many individuals fail to receive a full night of sleep."  <u>Id.</u> at 352-53; <u>see</u> <u>also</u> <u>Colwell v. Suffolk County Pol. Dep't</u>, 158 F.3d 635, 644 (2d Cir. 1998) ("difficulty sleeping is extremely widespread"). To that end, as little as 2-4 hours of sleep per night does not rise to the level of a substantial limitation.  <u>See</u>, <u>e.g.</u>, <u>Nuzum v. Ozark Auto. Distrib.</u>, 432 F.3d 839, 848 (8th Cir. 2005); <u>Humbles v. Principi</u>, 141 Fed. Appx. 709, 712 (10th Cir. 2005); <u>Boerst v. Gen. Mills Ops., Inc.</u>, 25 Fed. Appx. 403, 407 (6th Cir. 2002).  That Plaintiff's condition is not worse than the general population and does not rise to the level of a substantial limitation is underscored by her ability to sleep when taking Trazadone and her own report to Dr. Zaimes the day before the chocolate milk incident that her sleep was fine.  <u>Cf.</u> <u>Colwell</u>, 158 F.3d at 644 (finding plaintiff failed to establish substantial limitation where plaintiff testified he took a sleep aid and stated that he usually got "a tough night's sleep").

Furthermore, courts have recognized that "because sleep needs vary greatly from individual to individual, it is appropriate to examine the effects of plaintiff's sleep limitations on her waking activities." <u>Thompson v. Rice</u>, 422 F. Supp. 2d 158, 173 (D.D.C. 2006) (citing <u>Haynes v. Williams</u>, 392 F.3d 478, 486 (D.C. Cir. 2004)).  Despite her alleged difficulties in sleeping, Plaintiff has not missed work or been late to work a single day.  Likewise, there have been no complaints about the quality of Plaintiff's job performance.  Thus, Plaintiff cannot establish a substantial limitation on the activity of sleeping.  <u>Cf.</u> <u>id.</u> at 173 (finding no substantial

  
limitation on the activity of sleeping where plaintiff was able to work full-time, without any

record of excessive tardiness or absence, or diminution in the quality or quantity of her work).

Although it is not entirely clear, it appears from her Complaint that Plaintiff also alleges

she suffers from some "mental confusion".[14]  As Plaintiff explained, her memory loss means that

she sometimes would put things down and forget where to find them or make mistakes at work,

as everyone does.  However, "many other adults in the general population suffer from a few

incidents of forgetfulness a week, and indeed must write things down in order to remember

them."  Sara Lee, 237 F.3d at 353.  In this regard, Plaintiff's alleged difficulties in her ability to

think do not rise to the level of a substantial impairment under the ADA.  Cf. id. (no substantial

limitation where plaintiff forgot location of doctor's office, 2-3 times per week would forget

things and had to write them down to remember, and had trouble remembering to take second

dose of medication).[15]

---

[14] Plaintiff appears to allege that she cannot comply with Acme's well-known and universally
applicable policies preventing employee theft.  If Plaintiff cannot work without complying with rules
preventing employees from stealing from the company, then she is not qualified for the position.
Furthermore, Defendant need not accommodate Plaintiff in this matter.  Cf. Sara Lee, 237 F.3d at 353
("Independently of the undue hardship provision, an employer is required to make only those
accommodations that are 'reasonable.'  An employer must also be able to set a general policy and avoid
uncertainty and litigation over every request for an exception.  Indeed, the statute speaks in terms of
accommodations, not exceptions.  Virtually all circuits that have considered the issue have held that the
ADA's reasonable accommodation standard does not require an employer to abandon a legitimate and
non-discriminatory company policy.") (internal citation omitted).

[15] In the alternative, Plaintiff's disabilities so limit her that she is not qualified to perform the
weigher-wrapper job at Acme and, therefore, she is not a qualified individual with a disability under the
ADA.  In order to satisfy the definition of disabled under the ADA, a plaintiff needs to be able to perform
the essential functions of her position, with or without a reasonable accommodation.  Rohan v. Networks
Presentations LLC, 375 F.3d 266, 278-79 (4th Cir. 2004).  Plaintiff admits that she was not even sure
whether she could perform her job at the time of her termination.  (Pl. Dep. 157)  Further, Plaintiff
believes that as of July 1, 2006, she was not able to work in any job at all, and would not be able to do so
with any accommodation.  Therefore, because she cannot perform the essential functions of her position,
Plaintiff is not a qualified individual with a disability.

In this regard, the SSA found Plaintiff disabled under its rules as of July 1, 2006, prior to her
actual termination.  This finding by the SSA and Plaintiff's statements to the SSA that she was unable to
work because of her disabling condition on May 4, 2006 are inherently at odds with the necessary
assertion of Plaintiff's ADA claim that she is a qualified individual with a disability.  While the mere act

**D.      Plaintiff Cannot Establish that Defendants' Legitimate Reasons For Her Termination were a Pretext for Discrimination.**

       1.      <u>Defendants have articulated a legitimate, non-discriminatory reason for Plaintiff's termination.</u>

Even if Plaintiff is able to meet her burden of establishing a *prima facie* case of discrimination, Defendants have convincingly established a legitimate, non-discriminatory reason for her termination.  While Plaintiff contends that she was discharged from her employment because Defendants were motivated by discriminatory animus, there is abundant undisputed record evidence to establish that Acme terminated Plaintiff's employment because Plaintiff violated the employee purchase policy.  Here, it is undisputed that under Acme's employee purchase policies, of which Plaintiff was aware, an associate must pay for an item to be consumed during a break prior to consuming it, and that the associate must either tape the register receipt to that item or maintain the receipt.  Plaintiff was unable to provide Brittingham with proof that she paid for the chocolate milk.  Investigation by Acme further supported the conclusion that Plaintiff did not pay for the chocolate milk.  Therefore, Plaintiff's employment was terminated for violation of Defendants' employee purchase policies.

---

of applying for SSDI benefits does not preclude Plaintiff from making a subsequent ADA claim, to avoid summary judgment, she must "proffer a sufficient explanation for any apparent contradiction between the two claims." <u>EEOC v. Stowe-Pharr Mills, Inc.</u>, 216 F.3d 373, 378 (4th Cir.2000).  "[T]hat explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 807 (1999) (internal quotation marks omitted).  Here, Plaintiff has not rectified these inconsistencies. While this may be a facially harsh result, "contradictions are unacceptable:  a person who applied for disability benefits must live with the factual representations he made to obtain them, and if these show inability to do the job then [a disability discrimination] claim may be rejected without further inquiry." <u>Opsteen v. Keller Structures, Inc.</u>, 408 F.3d 390, 392 (7th Cir. 2005).

2.     <u>Plaintiff cannot establish that Defendants' articulated reason is a pretext for discrimination</u>.

In order to meet her burden of establishing that Defendants' articulated reason for her termination is a pretext for discrimination, in addition to satisfying a *prima facie* case, Plaintiff must provide "sufficient evidence…that [Defendants'] asserted justification is false or unworthy of credence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).  Plaintiff's evidence does not even approach the point of meeting this burden.

As a threshold matter, there is no dispute that Plaintiff engaged in prohibited conduct and was caught doing so.  Defendants maintain very specific policies regarding purchases by associates, and these policies required Plaintiff to either tape the sales receipt for her purchase to the item or to retain it.  Plaintiff was aware of these policies throughout the course of her employment with Acme.  On June 30, 2006, Plaintiff obtained a chocolate milk from the store's cooler, placed it in a bag, and walked out of the store with it.  When Plaintiff was asked for the receipt for this item, Plaintiff was unable to produce a receipt for it.  Further investigation by Acme revealed no record that Plaintiff had ever paid for the chocolate milk.  Thus, Plaintiff's termination was appropriate under Acme's policies.  While Acme's "zero tolerance" approach to violations of the associate purchase policy may be unwise, unfair or imprudent, that is not the relevant inquiry.  <u>See</u> <u>Grice v. Baltimore County</u>, 354 Fed. Appx. 742, 748 (4th Cir. 2009) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.") (quotation omitted).

At most, Plaintiff has pointed to a few other individuals over the course of more than 10 years whom she alleges, with little or no specificity, violated the employee purchase policy, but

were not discharged.[16]  Even if inferences drawn from these allegations may be sufficient to

satisfy her burden on the *prima facie* case (i.e. that similarly situated employees were treated

differently), it is clearly not dispositive of Plaintiff's burden to establish pretext, where the

factual inquiry into the motives of the employer has risen to a new level of specificity.  Simpson

v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998); Zboray v. Wal-Mart Stores East, LP, 650 F.

Supp. 2d 174, 185 (D. Conn. 2009) ("Moreover, the Plaintiff's listing co-workers who were not

disciplined for work-related matters, although possibly sufficient to get her past the *prima facie*

stage of her claim, is, without more, insufficient to demonstrate pretext."); Bernhardt v. Hygrade,

Inc., 1998 WL 401706, *4 (E.D. Pa. June 30, 1998) ("Although evidence that one comparator

was treated more favorably is sufficient evidence of discrimination at the initial stage of the

---

[16] As a threshold matter, those identified by Plaintiff do not even qualify as comparators for purposes of her *prima facie* case of discrimination.  To satisfy this prong of her *prima facie* case, Plaintiff must show that the similarly situated employees outside of her protected class were similarly situated in all material respects.  Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008).  "'The test for whether employees are similarly situated to warrant a comparison to the plaintiff is rigorous.'"  Simmons-Blount v. Guilford County Bd. of Educ., 2009 WL 962266, *6 (M.D.N.C. Apr. 7, 2009) (quoting Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001)).  Plaintiff cannot satisfy this test.  First, several of the individuals whom Plaintiff alleges violated the employee purchase policy are not similarly situated to Plaintiff.  Employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level are not similarly situated.  Lightner, 545 F.3d at 265.  Brittingham, Vargas and Crouse are non-union management employees, and thus not similarly situated to Plaintiff, an hourly, union employee.  Second, in order to be comparable, the alleged wrongdoing must "involve the same conduct without such mitigating circumstances that would distinguish [them] or the employer's treatment of them."  Heyward v. Monroe, 1998 WL 841484, *2 (4th Cir. Dec. 7, 1998).  That some 13 years before Plaintiff was terminated, a district manager, let a departing meat supervisor have old meat grinding equipment is not material in all respects.  Third, in order to be similarly situated, management must have knowledge of the alleged wrongdoing.  "Unknown misconduct is not 'similar in all relevant respects' to known misconduct."  Witherspoon v. Norfolk S. Corp., 2008 WL 516737 (E.D.N.C. Feb. 25, 2008) (citing McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006).  Here, Plaintiff admits that she did not report alleged violations of the employee purchase policy by Brittingham, Vargas, or Passwaters to anyone at Acme.  Furthermore, to Plaintiff's knowledge, such conduct was also not reported by the individuals who told her of the conduct.

Moreover, factual disputes about these alleged comparators are insufficient to defeat summary judgment.  "'Even if there is a question of fact as to [the existence of a *prima facie* case], the question of fact is not material because the proffered legitimate reason for [the employee's] termination … was not rebuffed effectively.'"  Jurosko, 2002 WL 570884, at *5 (quoting Haulbrook v. Michelin N. Am., 252 F.3d. 696, 706 (4th Cir. 2001)).

inquiry - the *prima facie* case - such evidence is not standing alone, necessarily dispositive at the pretext stage…."). A decision adversely affecting an employee in a protected group does not become a discriminatory decision merely because an employee outside of the protected group is treated differently. Simpson, 142 F.3d at 646. "[T]o hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." Id. (finding no inference of discrimination where plaintiff was treated the same as 34 members of the non-protected group). Here, it is undisputed that in a 23-month period surrounding Plaintiff's termination, Acme discharged 34 other employees in the Local 27 Eastern Shore Contract Area who had no known disabilities or requests for accommodation for violation of the associate purchase policy. Such facts defeat any inference of unlawful discrimination Plaintiff may seek to establish from her alleged comparators.

Furthermore, the ultimate inquiry always remains whether the decision was motivated by the employee's membership in a protected class. Simpson, 142 F.3d at 646. Plaintiff still must point to evidence from which a factfinder could infer discrimination apart from the fact that some members of one group are sometimes treated better and sometimes treated worse than members of another group. Id. Other than her own beliefs, Plaintiff has not pointed to any such evidence in this case.[17] Such unsupported assertions are insufficient to raise an inference of unlawful discrimination. See Boden v. U.S. Amada Ltd., 978 F. Supp. 657, 659 (E.D.N.C. 1997) (former employee's own beliefs and conclusory statements that he had been discriminated

---

[17] Even Plaintiff's own beliefs in this regard are dubious. Plaintiff often points to her union activity - not her alleged disability - as the reason she believes Defendants took actions against her.

against on the basis of his depression was not sufficient to raise reasonable inference of unlawful

discrimination).

Therefore, even if Plaintiff is a qualified individual with a disability under the ADA, she

has not established that Defendants' legitimate, non-discriminatory reason for her termination is a

pretext for unlawful discrimination.

**E.    Plaintiff Cannot Establish that Defendants Failed to Provide a Reasonable Accommodation for her Alleged Disability.**

1.    Plaintiff's failure to accommodate claims are barred by her failure to exhaust administrative remedies.

It is well-established the ADA requires a plaintiff to file a timely charge of discrimination

before pursuing a claim in state or federal court.  Mayers v. Wash. Adventist Hosp., 131 F. Supp.

2d 743, 746 (D. Md. 2001).  The plaintiff's administrative charge defines the scope of her

subsequent right to institute civil suit.  Id. (citing Smith v. First Union Nat'l Bank, 202 F.3d 234,

247 (4th Cir. 2000)).  "Only those discrimination claims stated in the initial charge, those

reasonably related to the initial charge, and those developed by reasonable investigation of the

original complaint may be maintained in a subsequently [ADA] lawsuit."  Evans v. Tech.

Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996).  "'Allowing a complaint to

encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the

EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the

charge, as surely as would an initial failure to file a timely EEOC charge.'"  Wells v. Briggs

Constr. Equip. Inc., 2010 WL 2991673, *7 (D.S.C. May 12, 2010) (quoting Dorsey v. Pinnacle

Auto. Co., 278 F.3d 830, 838 (8th Cir. 2002)).  To that end, "[w]hen a discrimination claim

'exceeds the scope of the EEOC charge and any charge that would naturally have arisen from any

investigation thereof,' it is procedurally barred."  Id. (quoting Dennis v. County of Fairfax, 55

F.3d 151, 156 (4th Cir. 1995)).

As a threshold matter, any failure to accommodate charge is time-barred.  The administrative charge must be filed within 300 days of the alleged wrongdoing.  42 U.S.C. 2000e-5(e).  Plaintiff's applicable EEOC charge was filed on May 3, 2007, more than 300 days after the June 7, 2006 note requesting that Plaintiff be scheduled no later than 8:00p.m. and Defendants' alleged refusal to provide grant the accommodation.  Therefore, Plaintiff's failure to accommodate claim is untimely.

Furthermore, in her charge of discrimination, Plaintiff describes the alleged violation as being solely related to her termination.  Notably, her charge makes no reference to any request by Plaintiff for an alleged accommodation of her disability or change in her schedule.  Nonetheless, in the current lawsuit, Plaintiff alleges that Defendants failed to provide a reasonable accommodation for her alleged disability.

Courts have recognized that a plaintiff's general allegation of disability discrimination is insufficient to satisfy the exhaustion requirement for both forms of disability discrimination - disparate treatment because of an alleged disability and a failure to accommodate the alleged disability.  Mayers, 131 F. Supp. 2d at 747.  To that end, where a plaintiff's charge alleges only disparate treatment on the basis of an alleged disability, with no reference to a request for a reasonable accommodation, a court cannot find that the EEOC charge encompassed a claim for failure to make reasonable accommodations.  See, e.g., id. at 747-48 (finding EEOC charge succinctly describing the timing and circumstances of discharge without mention of prior request for accommodation did not encompass failure to accommodate claim) (citing Jones v. Sumser Retirement Village, 209 F.3d 854, 853 (6th Cir. 2000) and Ramkin v. Greater Media, Inc., 28 F. Supp. 2d 331, 339-40 (D. Md. 1997)); see also Manson v. N.C. A&T State Univ., 2008 WL 2987071, *6 (M.D.N.C. July 31, 2008) (finding no exhaustion on failure to accommodate claim

where charge alleged only removal from a shift for purported disability).  This is especially true

where Plaintiff's silence about the denial of any requested accommodation is accompanied by a

denial that such accommodation is necessary to help her perform the essential functions of her

position.  Cf. Rohan v. Networks Presentation LLC, 175 F.2d 806, 810-11 (D. Md. 2001).

    Plaintiff has failed to exhaust her administrative remedy as to her alleged failure to

accommodate claim and, therefore, such claim should be dismissed.

> ### 2.      Plaintiff's requested accommodation was not necessary to perform the essential functions of her position.

    To establish a of failure to accommodate, Plaintiff must prove:  "(1) [s]he suffers from a

disability within the meaning of the ADA;[18] (2) the employer had notice of [her] disability; (3)

the plaintiff could have performed the essential functions of her position with reasonable

accommodation; and (4) the employer refused to make such accommodations."  Rhoads, 257

F.3d at 387.  However, Acme "is not required to provide [Plaintiff] with the specific

'accommodation [s]he may request, but only with reasonable accommodation as is necessary to

enable [her] to perform [her] essential functions.'"  EEOC v. Newport News Shipbuilding &

Drydock Co., 949 F.Supp. 403, 408 (E.D.Va.1996) (quoting Harmer v. Va. Elec. & Power Co.,

831 F.Supp. 1300, 1306 (E.D.Va.1993)); see also Talbot v. Acme Paper & Supply Co., 2005 WL

2090699, *6 (D. Md. Aug. 30, 2005) (quoting same).  Plaintiff is unable to demonstrate that she

requested a reasonable accommodation necessary to perform the essential functions of her

position.

    Plaintiff alleges that she requested to be permitted to leave at 8:00 p.m. on the days when

she is assigned to work an evening shift.  This accommodation is not necessary to assist Plaintiff

in performing the essential functions of her job.  First, Plaintiff was not looking to work a shorter

---

[18] As discussed at length above, Plaintiff is not a disabled person within the meaning of the ADA.

27

shift, as she intended to come in an hour earlier and work a full shift.  Second, Plaintiff

acknowledges that she requested the accommodation not for a medical purpose, but rather

because she did not want to drive home in the dark due to fear that her car may break down.[19]  A

denial of a request to grant an accommodation for such personal reasons cannot form the basis of

a disability discrimination claim under the ADA.  See Edmonson v. Potter, 118 Fed. Appx. 726

(4th Cir. 2004) (no failure to accommodate claim for refusal to grant schedule change where

requests were for personal convenience).  Third, even if Plaintiff needed an accommodation in

her schedule so as not to drive home in the dark for medical reasons, the requested

accommodation does not serve this purpose.  As Plaintiff acknowledged at her deposition, it

frequently gets dark well before 8:00p.m., so even when she leaves at that hour, she is still

driving home in the dark.

## V.       CONCLUSION

For any and all of the foregoing reasons presented herein, Defendants Acme Markets,

Inc. and Albertsons, Inc. respectfully request that the Court grant their Motion for Summary

Judgment and enter judgment in favor of Defendants on each and every one of Plaintiff's claims.

Respectfully submitted,

_____
Elizabeth Malloy, Esquire (admitted pro hac vice)
Peter Duhig, Esquire
Buchanan Ingersoll & Rooney, PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
Phone:  (215) 665-5310

Attorneys for Defendants
Acme Markets, Inc. and Albertsons, Inc.

---

[19] That Plaintiff's accommodation was for such personal, not medical, reasons is underscored by Plaintiff's multiple requests to change her schedule so as to not work evenings made before she was diagnosed with depression or Lyme disease.

28