IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KAY FARRELLY | : | |
| | : | |
| v. | : | Civil Action No. CCB-08-1992 |
| | : | |
| ACME MARKETS, INC., | : | |
| ALBERTSON'S, INC. | : | |

...o0o...

**MEMORANDUM**

Pending before this court is a motion for summary judgment filed by the defendants, Acme Markets, Inc. and Albertson's, Inc. Kay Farrelly, whose employment at an Acme store was terminated on July 27, 2006, has sued the defendants, alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act (ADA). The issues in this case have been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons that follow, the defendants' motion will be granted.

**BACKGROUND**

The following facts are undisputed. Acme Markets, Inc. operates retail grocery stores and pharmacies in Delaware, Maryland, New Jersey and Pennsylvania. (Declaration of Joan Williams, Defs.' Ex. 3 ("Williams Decl.") ¶2.) During a portion of the plaintiff's employment at Acme, Acme was a subsidiary of Albertson's. (*Id*. ¶3.) Farrelly was hired by Acme in 1977 and worked at Acme's Cambridge, Maryland store as a part-time weigher-wrapper in the deli and meat department. (Deposition of Kay Farrelly, Defs.' Ex. 1 ("Farrelly Dep.") 16-21.) Later, she worked at several of the defendants' other stores. (*Id*.) At all times during her employment, Farrelly was represented by the United Food and Commercial Workers Union, Local 27 ("Local

1

27"). (*Id.* 16.) During the 1980s, while employed at Acme's Salisbury, Maryland store, Farrelly was a union shop steward. (*Id.* 16-17.)

Farrelly's employment with Acme was terminated in June 1994, but she was later rehired. (*Id.* 61-62.) Farrelly believes that Acme fired her in 1994 because she was a shop steward and was "fighting for where [employees] didn't get paid." (*Id.* 62.) Later, Farrelly was promoted to a full-time weigher-wrapper position at Acme's Easton, Maryland store, and was the only person in this position. (*Id.* 70.) At all relevant times, the store director of the Easton Acme was Stuart Brittingham. (*Id.* 22.) Farrelly testified that she got along with Brittingham "fine." (*Id.* 71.)

Farrelly was diagnosed with depression and Lyme disease "a few years" prior to 2005, and was prescribed Zoloft for her depression. (*Id.* 76-77, 226.) Her depression became particularly severe after her fiancé was killed in an accident on July 8, 2005. (*Id.* 73, 76, 204.) Following his death, Farrelly's physician authorized a two-week sick leave, and Acme permitted her to stay out of work beyond the two weeks. (*Id.* 74.) Farrelly returned to work full-time on August 14, 2005, on the same schedule as before her leave. (*Id.* 73, 80.) Upon returning to work in August 2005, Plaintiff was able to walk, talk to customers, breathe, speak, hear, see, do her job, sit, stand, shower, seek medical attention, and pay her bills. (*Id*. 210-14, 218). She did find, however, that she had difficulty sleeping as well as remembering certain tasks. (*Id.* 124, 214-17, 280-81, 332.[1]) On May 25, 2006, Farrelly was evaluated by her psychiatrist, Dr. Jeanette Zaimes, who indicated in her notes that Farrelly suffered decreased sleep and was spending "3/4 night awake." (Pl.'s Ex. 1.) In other progress notes, Dr. Zaimes described Farrelly's sleep as "OK" on June 29, 2006 (Defs.' Ex. 5) or "decreased" in July and August 2006. (Pl.'s Ex. 2-4.)

---

[1] The following pages of the plaintiff's deposition appear only in Plaintiff's Exhibit 5: 267, 280-81, 331-32, and 345-48. Otherwise, all citations to her deposition are to excerpts included in Defendants' Exhibit 1.

Dr. Zaimes prescribed Trazodone, which helped her sleep. (Pl.'s Ex. 1; Farrelly Dep. 124.) During 2006, at various times, Dr. Zaimes also prescribed Ambien, Ativan, Wellbutrin and Zoloft. (Pl.'s Ex. 3, 4.) Although Farrelly spoke to Brittingham on many occasions about her depression and insomnia, she never missed a shift of work and was never late for work due to her sleeping difficulties. (*Id.* 218-19.)

In a letter dated October 20, 2006, Dr. Zaimes wrote:

> Ms. Farrelly was severely depressed at the time of the incident for which she was fired. She suffers from major depressive disorder. The symptoms of depression in [sic] include decreased concentration, pseudodementia (a condition that looks like dementia but is reversible), decreased energy, decreased sleep, increased anxiety, and feelings of hopelessness and helplessness. She suffered from all of these symptoms. It is my medical opinion that any actions that occurred during this period were not willful but simply a result of her symptoms.

(Pl.'s Ex. 6.)

Farrelly generally worked one late shift per week. (Farrelly Dep. 67-68, 80.) In November 2005, Farrelly requested permission to switch her late shift from Monday nights to Wednesday nights. (Request Off Form (Nov. 2, 2005), Defs.' Ex. 9.) She made the request so that she could see her therapist, Dr. Gay Kern, on Monday nights. (*Id.* 91, 347.) Acme granted this request, so that beginning on Monday, December 5, her shift on Mondays ended at 3:30 p.m. (Defs.' Ex. 10.) In addition, some time after she returned to work in August 2005 following her fiancé's death, Farrelly requested permission to start her late shift one hour earlier so that on those days she could leave by 8:00 p.m. (Farrelly Dep. 81-82, 124.) She wanted to leave by 8:00 p.m. to get home before it got dark, or at least darker than it otherwise would be by 8:00 p.m., although she did not have any problems driving in the dark. (*Id.* 99-101.) She wanted to leave by 8:00 p.m. because she was afraid her car would break down on the road, and because Dr. Zaimes suggested that coming home earlier would help her cope with her depression. (*Id.*)

3

By May 10, 2006, Acme had granted her request, because she was permitted to leave by 8:00 p.m., having worked a full day. (Williams Decl. ¶18, Ex. J.) On June 7, 2006, she presented a letter from Dr. Zaimes, apparently renewing her request to leave by 8:00 p.m. on her late days. (Defs.' Ex. 11.) On June 30, 2006, Farrelly attended a meeting with Stuart Brittingham as well as union officials Gil Cephas and Eric Masten. (Farrelly Dep. 345-46.) According to Farrelly, the purpose of the meeting was to discuss Farrelly's request to leave by 8:00 p.m. on her late days. (*Id*. 346-47.) Brittingham granted the request. (*Id.*)

On the morning of Friday, June 30, 2006, the same day as the meeting about her shift request, Farrelly took a container of Nesquik chocolate milk from the store's refrigerator case and put it in the back room until it was time for her break. (*Id*. 130.) She does not remember if she paid for the milk. (*Id.* 140.) She went to a register, placed the milk container in a bag, and walked out of the store with it. (*Id.* 140-43; Declaration of Stuart Brittingham, Defs.' Ex. 4 ("Brittingham Decl.") ¶6.) Acme associate Terry Passwaters, who was represented by Local 27, approached Brittingham and informed him that she had observed Farrelly take the milk from the store's refrigerator and walk out of the store without paying for it. (Brittingham Decl. ¶2.)

Brittingham went outside, where several associates, including Farrelly, were taking a break. (*Id.* ¶3.) Brittingham asked each person present to show him the sales receipt for the items being consumed. (Farrelly Dep. 143; Brittingham Decl. ¶3.) One associate stated that he purchased a soda from a vending machine and, therefore, did not have a receipt. (Brittingham Decl. ¶3.) Another associate produced a receipt for his tea, and another for his coffee. (*Id*.) Farrelly did not have a receipt for the chocolate milk she was drinking, which is not available from any vending machine at the Easton Acme. (*Id*.) Farrelly told Brittingham that she may have paid for it and began searching in a nearby trashcan. (Farrelly Dep. 140, 143.) She also

offered to pay for the milk "again." (*Id.*) After Farrelly returned to work, Brittingham searched the nearby trashcan, but found no receipt for the Nesquik. (Brittingham Decl. Ex. E.)

Upon returning into the store, Brittingham reviewed video from the store's surveillance cameras. (*Id.* ¶6.) The video showed the plaintiff walking through an unstaffed check-out line with an item in her hand, placing the item in a bag, and then walking out. (*Id.*) At no time did the video show that she paid for the chocolate milk. (*Id.*) The next day, Brittingham met with the plaintiff, Assistant Store Director Patty Feifer, and Local 27 shop steward Barbara Stanford. (Farrelly Dep. 146-47, 153.) The union shop steward requested that Acme review the electronic journal tapes from the store's cash registers from the previous day to find the chocolate milk purchase. (Brittingham Decl. ¶7.) Feifer reviewed all of the purchases made between 7:00 a.m. and 11:00 a.m. on June 30, 2006, and could not locate a purchase that consisted solely of a Nesquik chocolate milk. (*Id.* ¶7.)

Acme then suspended the plaintiff for violation of Acme's employee purchase policies. (Farrelly Dep. 148.) Those policies—one for "employees" and one for "associates"—both require the following:

> Any merchandise purchased for consumption or use by you on Company property during your regularly scheduled break or meal period must be purchased prior to consumption or use at the register designated by the Store Supervisor. The register tape must be retained as proof of purchase. This applies to all employees on all shifts whether the store is open or closed.

(Store Work Rules, Williams Decl. Ex. A, B.) Farrelly acknowledged in her deposition that she received copies of the store work rules or other similar guidelines on several occasions. (Farrelly Dep. 24-27.) She also acknowledged that she was aware of the employee purchase policy, and understood that employees were required to purchase merchandise they wished to consume, and must retain the register tape as proof of purchase. (*Id.* 28.)

On July 20, 2006, a grievance meeting was held regarding Farrelly's suspension. (Brittingham Decl. ¶11.) Farrelly did not attend the meeting. (Farrelly Dep. 153.) Local 27's business agents, Gil Cephus and Eric Masten, attended the meeting on Farrelly's behalf. (Letter from Stephen Moyer to Kay Farrelly (July 27, 2006), Defs.' Ex. 16.) At the conclusion of the meeting, Acme terminated Farrelly's employment, effective July 27, 2006. (*Id*.) Farrelly was sent a letter confirming her termination for violation of Acme's employee purchase policies. (*Id*.) The union did not pursue arbitration to contest Farrelly's termination. (Farrelly Dep. 289.)

Farrelly believes that she was fired "mostly" because of her "[u]nion work." (*Id.* 161.) After she was fired, a Local 27 member told Farrelly that he had spoken with an Acme attorney, who said, "[W]e finally got the one we wanted." (*Id*. 160, 163-64.) Farrelly testified, "Ever since I know about the union I know the contract and if I help people they're trying to get me." (*Id.* 161.) "They wanted me," she said, "because I won a lot of cases . . . against Acme markets." (*Id.* 162.) Indeed, Plaintiff believes that Acme "didn't care about a disability or anything else." (*Id*. 165.) When asked, "Do you believe that Acme discriminated against you on account of any disability when they terminated your employment?" she responded, "I don't know. I don't think so. . . . I don't know how they feel about that. They just wanted me gone." (*Id*. 165.) Later, she testified that she believed she was fired because "[t]hey just didn't like me." (*Id.* 169.) The plaintiff also believes that Brittingham was given recognition for firing Farrelly and another associate soon thereafter for union reasons. (*Id*. 168-69.)

Between January 1, 2006 and December 6, 2007, the defendants terminated the employment of thirty-five non-probationary associates in stores covered by the Local 27 Eastern Shore labor agreement, in whole or in part because of violations of Acme's employee purchase policy. (Williams Decl. ¶15.) Of these associates, none had self-identified as having a disability,

Acme did not observe that any of these employees had a disability, and Acme has no record of any of these associates requesting a reasonable accommodation for a disability. (*Id*. ¶16.)

On or about May 3, 2007, Farrelly filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Maryland Commission on Human Relations. In this charge, Farrelly checked the box for disability discrimination and stated that she was discharged "for erroneously taking a carton of milk during my break and forgetting to pay for it." (Charge of Discrimination, Defs.' Ex. 14.) The EEOC issued a right-to-sue notice on May 7, 2008, making no finding of a violation. (Defs.' Ex. 18.)

In January 2007, Farrelly applied for Social Security Disability Insurance ("SSDI") benefits. (Farrelly Dep. 317; SSI receipt, Defs.' Ex. 19.) In her application, she stated, "Became unable to work because of my disabling condition on May 4, 2006. I am still disabled." (Defs.' Ex. 19 at 1-2.) In August 2007, the Social Security Administration (SSA) found that Farrelly became disabled under its rules as of July 1, 2006. (SSA Notice of Award, Defs.' Ex. 20). The plaintiff believes that as of July 1, 2006, she was not able to work in any job at all, and would not be able to do so with any accommodation. (Farrelly Dep. 325-27.)

On August 1, 2008, Farrelly filed this lawsuit, alleging violations of the ADA and Title VII.[2] The defendants filed a motion for summary judgment on September 15, 2010.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this

---

[2] She also brought a claim under Maryland Code Annotated, Article 49B, but later withdrew that claim. (*See* Pl.'s Opp'n at 2.) She also originally sued the United Food and Commercial Workers Union, but on December 15, 2008, voluntarily dismissed the claims against the union.

standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *Id.* at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

Farrelly has sued the defendants under the ADA, which until 2009 prohibited a covered employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2006).[3] The ADA provides three alternative

---

[3] Congress recently broadened the definition of "disability" under the ADA through the ADA Amendments Act (ADAAA) of 2008, which went into effect on January 1, 2009. The ADAAA is silent on whether the provisions are retroactive. In the absence of express language of retroactivity, courts presume that a statute does not apply retroactively if doing so "would impair rights a party possessed when he acted, increase a party's liability for past

definitions of "disability." The one at issue here defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). To establish the existence of such a disability, a plaintiff must do more than simply point to a diagnosis of an impairment; he or she must show that the impairment substantially limits a major life activity. *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002).

ADA claims of disability discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework. *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The plaintiff must first make out a prima facie case of discrimination. *Ennis*, 53 F.3d at 58. To establish a prima facie case of discrimination under the ADA, a plaintiff must show that he or she: (1) has a disability; (2) is otherwise qualified for the job in question; and (3) has suffered an adverse employment decision as a result of discrimination. *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000). If she meets this burden, the defendants must articulate "some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Ennis*, 53 F.3d at 58. "If the defendant meets this burden of production, the presumption created by the *prima facie* case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." *Id.* In other words, the plaintiff must show that the employer's non-discriminatory rationale is a pretext for intentional discrimination

---

conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). The Fourth Circuit, in an unpublished opinion, has held that the ADAAA does not apply retroactively. *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 478 n.14 (4th Cir. 2010) ("Congress did not express its intent for these changes to apply retroactively, and so we look to the law in place prior to the amendments. . . . Our sister circuits have found that the 2008 ADA amendments are not retroactive . . . and we see no reason to disagree with their conclusion."). Here, the alleged discrimination occurred at the latest in July 2006, when Farrelly's employment with Acme was terminated. Therefore, I will assume that the pre-2009 statutory language controls.

on the basis of disability. *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 258-59 (4th Cir. 2006); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981).

The burden-shifting framework, however, should not be applied in a "rigid, mechanized, or ritualistic" manner. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). The framework is "merely a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question—whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against ['an individual with a disability because of the disability,' 42 U.S.C. § 12112(a) (2006)]." *Ennis*, 53 F.3d at 59.

Farrelly argues that she was "disabled" under the ADA because she suffered from two impairments—depression and Lyme disease—that substantially limited her ability to sleep and concentrate.[4] The defendants do not dispute that Farrelly suffered from depression and Lyme disease when her employment at Acme was terminated. Nonetheless, they argue that they are entitled to summary judgment for two reasons. First, they argue that no reasonable jury could find that Farrelly's sleep or concentration was "substantially limited," and thus she cannot make out a prima facie case of discrimination. Second, having proffered that Farrelly's termination was due to her alleged violation of the employee purchase policy, they argue that she cannot establish that this legitimate, non-discriminatory reason is a pretext for disability discrimination.

The court will assume without deciding that Farrelly has made out a prima facie case of disability discrimination. In response to Farrelly's claim, the defendants argue that Farrelly was fired not because of her depression or Lyme disease, but rather because she violated the

---

[4] The court will assume without deciding that under the pre-2009 ADA, concentrating and sleeping were major life activities. Although the ADAAA added sleeping and concentrating as expressly recognized major life activities, *see* Pub. L. No. 110-325, § 4(a), 122 Stat. 3553, 3555 (codified at 42 U.S.C. § 12102(2)(A)), neither the Supreme Court nor the Fourth Circuit have addressed whether they were "major life activities" under the pre-2009 ADA. Nonetheless, because the court finds that Farrelly has not met her burden of showing that the defendants' proffered explanation for her termination was a pretext for discrimination on the basis of disability, it need not decide the issue.

10

employee purchase policy. In so doing, the defendants have met their burden of proffering a legitimate, non-discriminatory explanation for why Farrelly was fired. Thus the burden shifts back to Farrelly, who must prove that this explanation is pretextual, and that in fact the defendants fired her because of her depression or Lyme disease. To survive summary judgment, she must point to sufficient evidence in the record from which a reasonable jury could find that the defendants intentionally discriminated against her on the basis of disability, and that her termination was the result of the defendants' discrimination. This Farrelly has not done.

There is no dispute that on June 30, 2006, Farrelly took a container of milk from one of Acme's refrigerator cases and carried it out of the store during her break. When asked to show proof of purchase, Farrelly did not have a receipt, as required by the employee purchase policy. Moreover, surveillance video showed the plaintiff walking past an unstaffed register with an item in her hand, placing the item in a bag, and then walking out, and the video did not show the plaintiff paying for the milk. The cash register records also showed that no purchase that day had consisted solely of a carton of Nesquik chocolate milk. There is also no dispute that Farrelly was aware of Acme's employee purchase policy, which requires that employees purchase any merchandise they wish to consume prior to consuming it, and requires that employees retain their receipts as proof of purchase.

The plaintiff argues that even assuming that Farrelly violated the employee purchase policy, the chocolate milk incident was a pretext for discrimination, for two reasons. First, the allegations that Farrelly took the milk arose on the same day she met with her supervisor and union officials about her request to leave by 8:00 p.m. on her late days. Farrelly argues that because she was requesting to leave early in part due to her depression, and because the allegations of the policy violation arose the same day, a reasonable jury could find that she was

11

terminated because of her depression. Second, she knows of three Acme employees who violated the employee purchase policy and were not fired. Farrelly testified that (1) Brittingham, her supervisor, once ate sandwich meat from the deli (Farrelly Dep. 179-80); (2) Casey Vargas, a non-union meat supervisor, also ate sandwich meat (*id.* 180-81); and (3) Terry Passwaters, who reported to Brittingham that Farrelly had taken the chocolate milk, once marked a certain kind of beef at an incorrectly low price. (*Id.* 182-83).[5] Because those people violated the policy and were not fired, Farrelly argues, her own violation of the policy cannot have been the true reason for her termination.

There is a substantial question as to whether Brittingham and Vargas are proper comparators for the pretext analysis, because they are non-union management employees. If a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, "[t]he similarity between comparators . . . must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). Although the employee purchase policy applied both to employees and management, that commonality does not necessarily mean that they were similarly situated. Moreover, even if they were proper comparators, Farrelly's argument is undermined by the fact that between January 1, 2006 and December 6, 2007, approximately thirty-five other non-probationary Acme associates in stores covered by the Local 27 Eastern Shore labor agreement were fired for reasons that included violations of the employee purchase policy. (Williams Decl. Ex. I.)

---

[5] She also testified that Walt Crouse, a former Acme district manager, allowed a former meat manager to have some meat cutting equipment to open his own shop. (Farrelly Dep. 183-87.) Farrelly reports, though, that Crouse was later fired for giving away the equipment. (*Id.* 187.) Because Crouse was fired, the fact that he violated the employee purchase policy is not evidence that Farrelly's firing for violation of the policy was pretextual.

12

The court need not resolve these questions, however, because even if a reasonable jury could find that the violation of the employee purchase policy was pretextual, no reasonable jury could find that the violation was pretext *for disability discrimination*. Rather, the only other explanation a reasonable jury could believe is that she was fired because of her work on behalf of Local 27 and her fellow unionized Acme employees. In fact, Farrelly admitted that Acme "didn't care about a disability." When asked, "Do you believe that Acme discriminated against you on account of any disability when they terminated your employment?" she responded, "I don't know. I don't think so." From her deposition it is apparent that she believes she was fired "mostly" because of her "[u]nion work." After she was fired, a Local 27 member told Farrelly that he had spoken with an Acme attorney, who said, "[W]e finally got the one we wanted." Farrelly testified, "Ever since I know about the union I know the contract and if I help people they're trying to get me." "They wanted me," she said, "because I won a lot of cases . . . against Acme markets." Farrelly also believes that her supervisor, Stuart Brittingham, was given recognition by Acme for firing Farrelly and another associate soon thereafter for union reasons.

Based on this evidence, no reasonable jury could find that the defendants terminated Farrelly's employment because of her depression or Lyme disease. *See Lightner*, 545 F.3d at 263-64 ("Plaintiff's claim founders on its terms. By the plaintiff's own repeated admission, the real reason for his suspension was to cover up department wrongdoing. This is not race or gender discrimination and therefore is not actionable under Title VII.")[6] Accordingly, there is no genuine dispute as to any material fact and the defendants are entitled to judgment as a matter of law.[7]

---

[6] Obviously, I do not suggest that firing an employee for union activity would be appropriate; it does not, however, constitute discrimination under the ADA.

[7] In Count 1 of her complaint, in addition to alleging a violation of the ADA, Farrelly alleges a violation of Title VII of the Civil Rights Act of 1964. Title VII, however, applies to claims of race, color, religion, sex and national origin

13

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be granted by a separate Order, which follows.

<u>Feb. 10, 2011</u>  /s/
Date  Catherine C. Blake
  United States District Judge

---

discrimination. 42 U.S.C. §2000e-2(a)(1). Here, the plaintiff has alleged only discrimination on the basis of disability. Therefore, insofar as Farrelly is seeking relief under Title VII, the defendants will be granted summary judgment on those claims as well.